UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                                    :

ROBERT ROGERS                  :           3:19 CV 0604 (RMS)
                                      :

V.                                :
                                      :

ANDREW SAUL,              :
COMMISSIONER OF        :
SOCIAL SECURITY[1]      :           DATE: MAY 26, 2020
                                      :
------------------------------------------------------ x

<u>RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION
OF THE COMMISSIONER</u>

       This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff

disability insurance benefits ["DIB"] and Supplemental Security Income benefits ["SSI"].

I.      <u>ADMINISTRATIVE PROCEEDINGS</u>

       On April 7, 2016, the plaintiff filed an application for DIB and SSI, claiming that he has

been disabled since January 1, 2013, due to "spinal [stenosis]," chronic obstructive pulmonary

disease, high blood pressure, and knee issues. (Certified Transcript of Administrative Proceedings,

dated June 24, 2019 ["Tr."] 63). The plaintiff's applications were denied initially, (Tr. 62-80, 82-

100), and upon reconsideration. (Tr. 104-116, 118-130). On March 16, 2018, a hearing was held

before Administrative Law Judge ["ALJ"] Ronald J. Thomas, at which the plaintiff and Mr.

---

[1] The plaintiff commenced this action action against Nancy A. Berryhill, as Acting Commissioner of Social Security.  (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. *See* FED. R. CIV. 25(d).  The Clerk of the Court shall amend the caption in this case as indicated above.

Warren Maxim, a vocational expert, testified. (Tr. 29-59). The plaintiff was represented by an attorney. (*Id.*). On June 28, 2018, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 11-22). The plaintiff filed a request for review of the hearing decision on July 26, 2018, (Tr. 229-232), and on March 1, 2019, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On April 23, 2019, the plaintiff filed his complaint in this pending action. (Doc. No. 1). On June 24, 2019, the defendant filed the administrative transcript. (Doc. No. 9). On July 24, 2019, the parties consented to the jurisdiction of a United States Magistrate Judge, and the case was transferred to the undersigned. (Doc. No. 13).  The plaintiff filed his Motion to Reverse on August 23, 2019, (Doc. No. 14), with a Statement of Material Facts (Doc. No. 14-1), and brief in support. (Doc. No. 14-2 ["Pl.'s Mem."]). On November 19, 2019, the defendant filed his Motion to Affirm (Doc. No. 17), with a Statement of Material Facts (Doc. No. 17-2), and brief in support. (Doc. No. 17-1 ["Def.'s Mem."]). For the reasons stated below, the plaintiff's Motion to Reverse (Doc. No. 14) is *denied*, and the defendant's Motion to Affirm (Doc. No. 17) is *granted.*

II.     FACTUAL BACKGROUND

        A.     HEARING TESTIMONY

At the time of his hearing, the plaintiff was 54 years old and was living with his girlfriend in Bridgeport, Connecticut. (Tr. 31-32).  He had been living with his girlfriend for "almost a year," and before that, he had lived with his mother. (Tr. 32). He had a car. (Tr. 33).

The plaintiff completed ninth grade but then dropped out of high school. (*Id.*). He last worked for Griffin Hospital in 2016 "doing some painting." (*Id.*). The job was full-time for approximately a month. (*Id.*). He completed the job but had problems with his back, knees, and

neck "doing the job." (Tr. 34). The plaintiff had been completing commercial painting jobs for a long time; the ALJ noted jobs for McKenzie and Everett Kaiser. (Tr. 34-35).

The plaintiff testified that he was unable to work because he had "a degenerative herniated disc in [his] neck," "nerve damage in [his] fingers," "bulging discs in [his] back," "spinal stenosis," "osteoarthritis in [his] knees," and "nerve damage in [his] feet." (Tr. 35). He testified that the worst condition was the spinal stenosis in his lower back, which caused pain every day, "[p]retty much through the whole day." (*Id.*). He took medications and had injections in his back. (Tr. 36). He also had neck pain every day, which stemmed from a work injury in "2009 or 2010." (*Id.*). He also testified as to his chronic obstructive pulmonary disease. He mentioned that he had problems breathing "[i]f [he is] doing anything, you know, . . . trying to work a little bit," and he specifically had problems when walking or climbing stairs. (Tr. 37). He used medications for his breathing problems. (*Id.*). He also received injection shots in his right knee. (Tr. 38). He had pain in his right knee "[w]henever [he] walk[ed] on it" and thus would use a cane. (*Id.*).

The plaintiff testified that he could lift 13-15 pounds. (Tr. 39). He had trouble standing: "If I'm standing 10 minutes, I'm – my feet feel like I'm straining, and it feels like I'm standing on a ball[.]" (*Id.*). He had trouble sleeping; he would "keep tossing and turning because of [his] neck." (*Id.*). He would only wear sweatpants because wearing a belt "bother[ed] [his] back." (Tr. 40). He had trouble putting his socks on and using stairs; he would use his hands to climb the stairs when going up and would sit down when going down. (*Id.*). He could make a simple meal, drive locally, and go to the grocery store, but he did not go to the store often. (Tr. 40-41). He could not do yard work, drive far distances, or carry a laundry basket down the stairs. (Tr. 40). He did not take any trips, have any hobbies, or go out socially. (Tr. 41). He would spend his days "on the couch or on the recliner," spending "no more than 20, 25 minutes" "on [his] feet." (*Id.*). He also testified that

"if [he] had to walk . . . a half a football field, [he'd be] in excruciating pain." (Tr. 43). He would then have to sit down for "maybe 10 minutes." (*Id.*). He could sit on a regular chair for 10-15 minutes before needing to "go lay down on the couch." (Tr. 43-44).

The plaintiff testified that he could "probably not" go to the grocery store, walk to the back of the store, and carry a gallon of milk to the checkout without losing his balance. (Tr. 44). He also mentioned the nerve damage in his hands, explaining that when he would sneeze or cough, it "fe[lt] like a lightning bolt, going right down into [his] fingers." (Tr. 45). He could button his shirt but would have difficulty with "fine manipulation" for a long period of time. (*Id.*). He could not, for example, hold a pen and write a full letter. (*Id.*). He thought he could sit down and write something for ten to fifteen minutes before his neck and hands would bother him. (Tr. 45-46). He could "slice a tomato" but could not chop vegetables or do similar activities "for long." (Tr. 47). Bending his head to look down bothered him, as well as bending down and lifting even light objects like a box of tissues. (Tr. 47-48). He explained that the bending motion caused his back, knees and feet to bother him. (Tr. 48). The pain also affected his ability to concentrate and focus. (Tr. 49).

A vocational expert ("VE") testified at the plaintiff's hearing that the plaintiff's past work corresponded to construction painter, a skilled occupation customarily performed at the medium exertional level, but performed by the plaintiff between the medium exertional level to the very heavy exertional level throughout the course of his career. (Tr. 52). He testified that the skills from the plaintiff's past relevant work as a construction painter did not transfer to other work. (*Id.*). The ALJ then asked the VE to assume the following hypothetical individual: an individual of the plaintiff's age, education, and work background, limited to performing sedentary work, and who was unable to sustain competitive pace and stay on task for more than 80% of the time in the workplace due to the need to be on a couch or in a recliner for all but 20-25 minutes in an average

16-hour work period. (Tr. 52-53). The VE testified that the hypothetical individual described above could not perform the plaintiff's past work. (Tr. 53). Nor could such individual perform "successful, sedentary work in any occupation." (Tr. 53).

The ALJ then asked the VE to assume a second hypothetical individual: an individual of the plaintiff's age, education, and past work experience, limited to performing light work, with the additional limitations of occasional twisting, squatting, bending, balancing, kneeling, crawling, and climbing, and no climbing of ropes, scaffolds or ladders. (*Id.*). Such an individual would require an environment free from concentrated poor ventilation, dust, fumes, gases, temperature extremes, wetness, humidity, and odors. (*Id.*). This individual could drive, but had to avoid hazards such as vibration, dangerous machinery and heights, and could not use right foot controls. (*Id.*). The VE testified that the hypothetical individual described above could not perform the plaintiff's past work, but could perform the occupations of fast-food worker, coffee shop attendant, and parking lot attendant. (Tr. 54).

For the last hypothetical, the ALJ asked the VE to assume the following individual: an individual of the plaintiff's age, education, and past work experience, limited to the medium exertional level, but with four additional limitations. (Tr. 54-55). The individual could not climb ropes, scaffolds or ladders, must be in an environment free from concentrated poor ventilation, dust, fumes, gases, odors, humidity, wetness, and temperature extremes, must avoid hazards such as heights, vibrations and dangerous machinery, and could not use right foot controls. (*Id.*). The VE testified that the hypothetical individual described above could not perform the plaintiff's past work, but could perform the occupations of laborer, stores; laborer, salvage; and vehicle cleaner. (Tr. 55).

B.   <u>MEDICAL HISTORY</u>

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the parties' respective Statements of Material Facts. (Doc. Nos. 14-1, 17-2). Though the Court has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.

A February 19, 2010 MRI of the plaintiff's cervical spine revealed multilevel degenerative changes "most prominent at the C5-6 level where there is very mild cord impingement" with "marked foraminal stenosis," and "[f]airly marked right foraminal stenosis at C4-5." (Tr. 350). There was "no cord compression." (*Id.*). On March 5, 2010, the plaintiff presented at Southwest Community Health Center complaining of "pressure on his neck"; the pain "r[an] down his right arm" and he "fe[lt] [a] shocking sensation in his middle finger and ring finger." (Tr. 345). He returned on March 28, 2010 and September 9, 2010, for hypertension and neck pain. (Tr. 343-44). On January 20, 2011, he presented with chronic neck pain with numbness and tingling in his arms and hands bilaterally. (Tr. 342). His symptoms increased with coughing, and he reported 75% pain relief with the medication Norco. (*Id.*). On April 29, 2011, he continued to report left hand pain and tension in the back of his neck. (Tr. 340). He had painful range of motion of his neck. (*Id.*). The plaintiff attended physical therapy beginning May 12, 2011. (Tr. 355).

On November 18, 2011, the plaintiff returned for a follow-up for his hypertension and chronic pain. (Tr. 339). He reported 50% relief with his current medication regimen. (*Id.*). He next appeared for a follow-up for his hypertension and chronic pain on April 4, 2012. (Tr. 338). Treatment notes indicate that he complained of neck pain radiating to his arms and hands bilaterally, worse on the left side. (*Id.*). He reported "good relief" with pain medication. (*Id.*). He had painful range of motion of his neck. (*Id.*). On May 7, 2012, he reported ongoing left arm pain

and neck pain, and on June 7, 2012, he said he had neck pain. (Tr. 336-37). On July 21, 2012, he presented to the St. Vincent's Medical Center Emergency Department with chest pain, syncope and collapse. (Tr. 438). He had felt weak all day and had consumed alcohol and smoked marijuana with Vicodin. (Tr. 438, 451). He was discharged on July 22, 2012. (Tr. 451). On August 7, 2012, the plaintiff continued to report neck pain and to seek medication refills. (Tr. 335). On September 7, 2012, he reported neck and hand pain. (Tr. 334). He needed more medication, as he had been breaking some pills in half. (*Id.*). He had painful range of motion in his neck. (*Id.*). On October 5, 2012, he had no relief of his neck and left arm pain. (Tr. 333). He had painful range of motion of his cervical spine. (*Id.*).

On June 7, 2013, the plaintiff presented with sharp left elbow pain that was aggravated by lifting. (Tr. 363). He asked to be referred to pain management. (*Id.*). He also had joint pain, neck pain, and numbness in his extremities. (*Id.*). A July 11, 2013 MRI of the plaintiff's cervical spine revealed multilevel degenerative changes with "associated central stenosis with mild cord impingement at the C5-6 level which is similar to the previous study . . . [,] [with] evidence of myelomalacia," and "marked RIGHT foraminal stenosis at C4-5 and marked bilateral foraminal stenosis at C5-6 which is similar to the prior study." (Tr. 415-16). A July 11, 2013 MRI of the plaintiff's lumbar spine revealed "[s]mall disc protrusions at multiple levels," with no "associated central canal stenosis or cord compression." (Tr. 413-14). A July 11, 2013 MRI of the plaintiff's thoracic spine showed mild multilevel degenerative changes with "associated moderate central canal stenosis at L3-4 and mild central canal stenosis at L4-5," with no evidence of nerve root compression but with "enhancement of the nerve roots of the cord at clinical limited to the L3-4 level." (Tr. 417-18). It also showed a "[v]ery small LEFT paracentral disc protrusion at T12-L1." (Tr. 418).

The plaintiff returned to the Southwest Community Health Center on August 7, 2013, complaining of chronic pain in his lower back that radiated down his legs. (Tr. 367). He rated his pain at a ten out of ten. (Tr. 368). On examination, he had severe pain with motion of his cervical and lumbar spines. (Tr. 369). On September 10, 2013, he reported chronic lower back, neck and arm pain, and requested to increase his dose of Vicodin. (Tr. 371). On examination, he had muscle spasms and moderate pain with motion of his cervical and lumbar spines. (Tr. 374).

On September 25, 2013, the plaintiff saw Dr. Janak Srinivasan, M.D., for chest pain, "happening 6-8 times per year," which radiated to his jaw. (Tr. 420). Dr. Srinivasan diagnosed "chest pain, unspecified," and "hypertension, benign." (*Id.*). He returned on September 28, 2013, for recurrent chest discomfort and hypertension. (Tr. 836). An October 4, 2013 myocardial perfusion SPECT imaging study indicated normal results. (Tr. 837). The plaintiff returned to Dr. Srinivasan on October 8, 2013, for chest discomfort. (Tr. 838-39). Dr. Srinivasan's diagnoses remained the same, and he recommended a follow up appointment in six months. (*Id.*).

On October 10, 2013, the plaintiff returned to Southwest Community Health Center for a routine follow up. (Tr. 376). He reported pain in his neck, left hand and lower back. (Tr. 376-77). On examination, he had muscle spasms and moderate pain with motion of his cervical and lumbar spines. (Tr. 378). On October 31, 2013, he reported "a lot" of pain in his lower back that radiated down both legs. (Tr. 381). His hands and arms would become numb and tingle at times. (*Id.*). His functional status had not changed. (Tr. 383). On examination, he had muscle spasms in his lumbar and cervical spines and severe pain with motion in his cervical spine. (Tr. 384). On December 23, 2013, he presented for a follow-up appointment for his hypertension. (Tr. 386). He had muscle spasms and moderate pain with motion of his cervical and lumbar spines. (Tr. 388).

On January 23, 2014, the plaintiff complained of increased lower back pain. (Tr. 390). He had fallen on the ice "a couple of weeks ago." (*Id.*). He reported that the pain radiated to his left and right thigh; he described the pain as "an ache, discomforting, piercing and sharp." (*Id.*). He had muscle spasms and moderate pain with motion of his cervical and lumbar spines. (Tr. 393). On March 22, 2014, he returned for treatment of GERD and arthralgias. (Tr. 395). He was positive for back pain. (Tr. 396). He was counseled to lose weight. (Tr. 397). On June 6, 2014, he presented with intermittent back pain radiating to his legs. (Tr. 400). Treatment notes reflect that the plaintiff reported worsening pain with bending and activity. (*Id.*). Dr. Gerard Abidor, D.O., assessed chronic pain syndrome and hypertension. (Tr. 402). On July 7, 2014, July 19, 2014, and July 26, 2014, the plaintiff reported right elbow swelling. (Tr. 404-07, 477-78, 474). On August 18, 2014, the plaintiff saw Dr. Abidor for chronic pain. (Tr. 409). Dr. Abidor noted that the plaintiff was "stable" and that he would renew his prescription for hydrocodone one last time; in the future, the plaintiff would have to visit pain management for prescription pain relief. (Tr. 411).

On September 12, 2014, the plaintiff presented to Dr. Emmanuel Logiadis, M.D. (Tr. 489). Dr. Logiadis noted the plaintiff's history of cervical disc disease in his neck and sciatica pain. (*Id.*). Treatment notes indicate that the plaintiff reported neck pain, shortness of breath, wheezing, heartburn, and muscle aches, but no soft tissue swelling or localized joint pain. (Tr. 490). On examination, he had full range of motion in his fingers, wrists, elbows, shoulders, thoracolumbar spine, knees, hips, and ankles. (Tr. 491). He did not have full range of motion in his cervical spine or lumbosacral spine. (*Id.*). Dr. Logiadis prescribed medication. (*Id.*). On October 8, 2014, the plaintiff presented to Dr. Logiadis, complaining of shortness of breath, chest pain, palpitations and bloating. (Tr. 494-95). An x-ray of the plaintiff's chest showed no active pulmonary disease. (Tr. 497). On October 17, 2014, Dr. Logiadis assessed asthmatic bronchitis and chronic obstructive

pulmonary disease and advised the plaintiff to quit smoking. (Tr. 501). The plaintiff reported "some improvement" with his breathing on December 3, 2014. (Tr. 502).

On April 3, 2015, the plaintiff saw Dr. Logiadis for "elevated blood pressure." (Tr. 645). Treatment notes indicate that he was exercising and adhering to a low salt diet. (*Id.*). He had decreased range of motion, tenderness, pain and spasm in his cervical spine. (Tr. 647). On October 19, 2015, he presented to Dr. Logiadis for his annual exam. (Tr. 515). He had not quit smoking and was positive for cough and shortness of breath. (*Id.*). He had normal range of motion in his neck and musculoskeletal system, with no edema or tenderness. (Tr. 517). His reflexes were normal, and he had normal muscle tone and coordination. (*Id.*). Dr. Logiadis noted that plaintiff's sciatica was stable on percocet, his hypertension was "at goal on exforge," and his chronic obstructive pulmonary disease was "stable with symbicort and spriva." (Tr. 518).

On March 3, 2016, the plaintiff saw Dr. Logiadis for bilateral knee pain. (Tr. 526). He had back and joint pain. (Tr. 527). He had normal range of motion in his neck and musculoskeletal system, with no edema or deformity, though there was tenderness. (*Id.*). An x-ray of his knees showed "[n]o significant findings or significant arthropathy" and "no evidence of acute or healing fracture, dislocation or osteochondral defect." (Tr. 674). There were "no significant arthritic changes," "no evidence of pathologic calcification [of] the soft tissues," and "no evidence of joint effusion." (*Id.*). On March 18, 2016, the plaintiff presented with bilateral knee pain and leg weakness. (Tr. 534). He had normal range of motion, but he could not stand on his toes. (Tr. 535). Dr. Logiadis noted that the plaintiff's knee pain was "most likely due to back pain" and recommended an MRI. (Tr. 537). On April 11, 2016, the plaintiff complained of knee and lower back pain, but he had normal range of motion, reflexes, muscle tone and coordination. (Tr. 543). An April 14, 2016 MRI of the plaintiff's right knee showed "[m]oderate medial compartment

osteoarthritis," "[r]adial tear of the posterior one third of the medial meniscus near the medial meniscal root," and "Grade 1 strain of the medial and lateral head of the gastrochemius muscles." (Tr. 612). That same day, an MRI of the plaintiff's lumbar spine revealed "[m]inimal to mild degenerative disc disease at all lumbar levels," "[m]ultifactorial spondylosis from L2-3 through L5-S1" causing "spinal stenosis and foraminal stenosis at L3-4 and L4-5 without . . . nerve root impingement," and a "[s]table, small left paramedian disc herniation at T12-L1." (Tr. 622). The report reflects "no significant change" when compared to the previous MRI. (*Id.*).

On May 10, 2016, the plaintiff saw Dr. David B. Brown, M.D., an orthopedic surgeon, for right knee pain. (Tr. 615). He reported "increasing knee pain for the past several months" and noted a "sense of adjustment, locking and occasional giving way to the right knee." (*Id.*). He stopped working as a painter four weeks ago because of the knee pain. (*Id.*). Dr. Brown reviewed the plaintiff's medical history and MRI results. (*Id.*). On examination, Dr. Brown noted that "[i]nspection of the knee demonstrate[d] a small joint effusion"; "[t]here [was] provocative pain posteromedially on flexion beyond 100 degrees"; "[t]here [was] a positive McMurray sign posteromedially"; and, "[t]here [was] no joint laxity and . . . no instability." (*Id.*). He also noted that the x-ray of the plaintiff's right knee "demonstrate[d] very mild medial compartment narrowing." He diagnosed a "[t]ear posterior horn medial meniscus, medial compartment osteoarthritis," and recommended a right knee arthroscopy, partial medial meniscectomy. (*Id.*).

On May 24, 2016, the plaintiff had a right knee arthroscopy with no complications. (Tr. 609-10). Treatment notes from a June 2, 2016 appointment with Dr. Brown reflect that the plaintiff's arthroscopic portals were healing satisfactorily, his sutures were removed, and the plaintiff "appear[ed] to be satisfied with his progress." (Tr. 611). Dr. Brown referred him to physical therapy on June 15, 2016. (Tr. 616). The plaintiff reported pain and limitations with

walking and climbing stairs. (Tr. 617). Treatment notes from the physical therapist reflect that he could not squat and had difficulty going from sitting to standing. (*Id.*). On ambulation, he had a very minimally ataxic quality of movement and a widened base of support. (Tr. 618). He had good range of motion in his knee and minimal strength deficits. (*Id.*). On June 28, 2016, the plaintiff presented to the emergency room for abdominal and chest pain. (Tr. 678).

On October 3, 2016, the plaintiff saw Dr. Logiadis for knee pain, back pain, and foot callouses. (Tr. 628). After a physical therapy visit about one month after his surgery, his right knee began to feel worse and the pain had persisted since then. (*Id.*). He had difficulty walking and would hear his "knee clicking." (*Id.*). The pain was sharp and only present when walking. (*Id.*). His medication helped to "mask his knee pain." (*Id.*). His left knee also bothered him; he stated that he had difficulty supporting himself on his left knee. (*Id.*). His lower back pain—described as a sharp pain—was worse with movement and had been managed with Norco. (*Id.*). He reported not being able to stand on his tiptoes for "the past year or so." (*Id.*). He denied any numbness or tingling in his lower legs. (*Id.*). Treatment notes indicate that the plaintiff took three Norco a day for the pain, which reduced but did not resolve the pain. (*Id.*). He had normal range of motion bilaterally, but his right knee was warmer than his left knee. (Tr. 629). An x-ray of his right knee revealed moderate primary osteoarthritic changes, while an x-ray of his left knee revealed a "[n]egative study." (Tr. 793). On December 2, 2016, the plaintiff returned to Dr. Brown. (Tr. 632). Treatment notes reflect "moderate pain medically on knee flexion," with "no instability," and a diagnosis of "bilateral knee medial compartment osteoarthritis." (*Id.*).

On January 19, 2017, the plaintiff underwent a "viscosupplementation" injection in his right knee, as recommended by Dr. Brown. (Tr. 632, 847). On February 3, 2017, he saw Dr. Logiadis for hypertension. (Tr. 748). He had quit smoking. (*Id.*). He reported back pain but had

full range of motion, normal reflexes, and normal muscle tone on examination. (*Id.*). He presented to Dr. Logiadis on March 21, 2017, reporting worsening pain and pain radiating into his right hip. (Tr. 739). He exhibited normal range of motion in his musculoskeletal system but with tenderness. (Tr. 740). A March 30, 2017 MRI of the plaintiff's lumbar spine showed multilevel degenerative changes, "some of which [were] increased as compared to 4/14/2016." (Tr. 658). The changes were "most prominent at L4-5, where an increased disc bulge and facet arthropathy result[ed] in moderate to severe spinal canal stenosis, as well as moderate bilateral neuroforaminal stenosis." (*Id.*). There was also "moderate neuroforaminal stenosis at L4-5 on the right." (*Id.*). The MRI report also revealed "[i]ncreased T2 signal abnormality/enhancement in the interspinous regions at L3-4 and L4-5, findings suggestive of Baastrip's disease." (*Id.*).

On April 13, 2017, the plaintiff saw Dr. Gary A. Zimmerman, M.D., at Connecticut Neurosurgical Specialists. (Tr. 677). On examination, the plaintiff demonstrated no lumbar tenderness, his motor strength was normal, his sensation was intact, he had no pain upon straight leg raising, and his gait was mildly antalgic. (*Id.*). Dr. Zimmerman noted that the plaintiff's recent MRI of the lumbar spine was "notable for multi-level spondylotic change, but only moderate stenosis"; the "MRI [was] not severe" and the plaintiff was "neurologically stable." (*Id.*). He referred the plaintiff to physical therapy. (*Id.*).

On June 2, 2017, the plaintiff saw Dr. Logiadis for his annual exam. (Tr. 732). He continued to have back and knee pain; he had normal range of motion, reflexes, muscle tone and coordination. (Tr. 732-34, 736).

At a June 30, 2017 appointment with Dr. Brown, the plaintiff continued to complain of right knee pain. (Tr. 846). He walked with a "slight antalgic gait for weightbearing to the right knee." (*Id.*). There was "no joint swelling" upon inspection of the knee, but there was "provocative

pain on knee flexion beyond 90 degrees referable to medial compartment." (*Id.*). Dr. Brown assessed osteoarthritis. (*Id.*).

On August 23, 2017, the plaintiff saw Dr. Logiadis for hypertension. (Tr. 728). He reported back and neck pain. (Tr. 729). On examination, he had normal range of motion of his musculoskeletal system, but with no edema or deformity. (*Id.*). He exhibited tenderness, and he had a positive straight leg raise bilaterally. (*Id.*). He returned to Dr. Brown on September 1, 2017, reporting low back pain. (Tr. 845). He reported "prominent stiffness on awakening in the morning" and "[a]fter walking just 1 bock, . . . an increase in pain extending to the legs." (*Id.*). He walked without "any clear antalgic gait," but there was "a sense of low back pain on flexion and rotation of the lumbar spine." (*Id.*). Dr. Brown also noted "back pain only on straight leg raising without any clear referred pain pattern or any prominent neurologic deficit." (*Id.*). Dr. Brown advised the plaintiff to continue over-the-counter anti-inflammatory medication. (*Id.*).

On October 10, 2017, the plaintiff saw Dr. Kenneth Lipow, M.D., also with Connecticut Neurosurgical Specialists. (Tr. 801). He reported bilateral posterior lower extremity pain with difficulty walking. (*Id.*). He reported a "new onset of continuous low back pain" after he hit several potholes riding his motorcycle and stated that he had been using a cane for the last year and a half "for long walks." (*Id.*). He felt "fasciculations down the right, great than left lower extremity." (*Id.*). On examination, he could flex, he had a shuffling gait, he could not stand or walk on his toes due to weakness, and straight leg raising was negative bilaterally to 90 degrees. (*Id.*). Dr. Lipow recommended MRIs of the plaintiff's cervical and lumbar spines, as well as x-rays and nerve conduction studies. (Tr. 802). On November 14, 2017, the plaintiff returned to Dr. Lipow for upper extremity pain. (Tr. 799). He reported "left . . . greater than right upper extremity radiating pain shooting to the middle finger." (*Id.*). He could not walk on his toes and he had an anteflexed gait.

(*Id.*). He demonstrated "5/5 strength" in the upper extremity, his "sensory appreciation was intact bilaterally," and there was "no percussion tenderness of the cervical spine." (*Id.*). His "cervical range of motion was decreased in right head rotation." (*Id.*). He also complained of low back pain with no extremity radiculopathy. (*Id.*). Dr. Lipow recommended an epidural injection for the lumbar issues and non-surgical management for the cervical issues. (Tr. 801).

A November 14, 2017 MRI of the plaintiff's lumbar spine showed a "[s]mall left-sided disc herniation at T12-L1 and multilevel degenerative changes, essentially unchanged since 3/3/2017," with "associated mild central canal stenosis and mild to moderate foraminal narrowing, most pronounced at L3-4 and L4-5" and "[n]o new disc herniations." (Tr. 807). That same day, an MRI of the plaintiff's cervical spine showed "[m]ild anterolisthesis of C4 on C5, new since 7/11/2013, may be due to instability," "[m]ild ventral cord impingement and myelomalacia at C5-6, essentially unchanged," and "[m]ultilevel degenerative changes, essentially unchanged," with "associated central canal stenosis, mild at C4-5 and C5-6." (Tr. 809). "Foraminal narrowing remain[ed] severe on the right at C4-5 and severe bilaterally at C5-6, otherwise mild to moderate." (*Id.*). There was "[n]o new disc herniation." (*Id.*).

On January 9, 2018, the plaintiff saw Dr. Vito Errico, M.D., for back pain. (Tr. 805). He reported pain upon bending and stiffness with walking. (*Id.*). He had negative straight leg raise tests bilaterally and five out of five muscle strength in the upper and lower extremities. (*Id.*). Dr. Errico recommended an L4-L5 midline epidural steroid injection, which the plaintiff had on January 30, 2018. (Tr. 804-805).

C.    <u>OPINION EVIDENCE</u>

On September 26, 2016, the plaintiff presented to Dr. Herbert Walter Reiher, M.D., for a consultative examination. (Tr. 624-27). Dr. Reiher noted the plaintiff's prior medical history: a

herniated cervical disc and bulging lumbar disc, diagnosed in 2016, for which he had no surgeries or epidurals; episodic neck pain, radiating to the left arm with tingling and episodic low back pain, radiating to the left leg and buttock; spinal stenosis, diagnosed by an MRI with no further treatment planned; left and right knee pain; chronic obstructive pulmonary disorder; and high blood pressure. (Tr. 624). The plaintiff reported smoking one and a half packs of cigarettes per day, with occasional alcohol and marijuana use. (Tr. 625). He "appeared to be in no acute distress," his gait was normal, he could do a "half squat," his stance was normal, he used no assistive devices, he did not need help changing or getting on and off the exam table, and he could rise from his chair without difficulty. (*Id.*). He could not, however, walk on his heels and toes without difficulty. (*Id.*).

On examination, the plaintiff's cervical and lumbar spines "show[ed] full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." (Tr. 626). There was "[n]o scoliosis, kyphosis, or abnormality in [his] thoracic spine." (*Id.*). A straight leg raising test was negative bilaterally. (*Id.*). He had full range of motion of his shoulders, elbows, forearms, wrists, hips, and ankles bilaterally. (*Id.*). His left knee flexion was "full," while his right knee flexion was "120 degrees." (*Id.*). There was no "evident subluxations, contractures, ankylosis, or thickening." (*Id.*). His joints were stable and nontender, with no redness, heat, swelling or effusion. (*Id.*). There was, however, "decreased sensation to light touch in the right knee." (*Id.*). His strength was five out of five in the upper and lower extremities. (*Id.*). His hand and finger dexterity were intact, with five out of five grip strength bilaterally. (*Id.*).

Dr. Reiher gave the plaintiff a "stable" prognosis, opining that the plaintiff had "mild postural limitations due to back, neck, and knee pain, producing mild limitations with climbing, stooping, bending, crawling, kneeling, crouching, and reaching." (Tr. 627). He did not have any fine motor, vision, hearing, or speech limitations, but he did have "environmental limitations of

exposure to dust, fumes, and smoke, which could produce shortness of breath, and heights, which could produce decreased balance." (*Id.*).

State agency reviewer Dr. Joyce Fong-Breton, M.D., opined on October 24, 2016 that the plaintiff could occasionally lift and carry twenty pounds; could frequently lift and carry ten pounds; could stand and/or walk (with normal breaks) and sit (with normal breaks) for six hours in an eight-hour workday; and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (Tr. 73, 75-76). She also opined, however, that the plaintiff could never climb ladders, ropes or scaffolds, and that he needed to avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, and poor ventilation. (Tr. 75-76). She noted that the plaintiff did not need a hand-held assistive device for ambulation. (Tr. 75). Upon reconsideration, Dr. Kenneth Glass, M.D., opined to substantially the same limitations as Dr. Fong-Breton, the only difference being an additional limitation on avoiding hazards, such as machinery and heights. (Tr. 124-129).

On September 13, 2017, Dr. Emmanuel Logiadis, M.D., one of the plaintiff's treating physicians, provided a letter. (Tr. 743). He noted that the plaintiff "[had] been a patient of [his] for several years." (*Id.*). He explained that the plaintiff had been treated for "debilitating back pain that [had] become progressive," L4-L5 disk disease and spinal stenosis, and osteoarthritis in both knees. (*Id.*). According to Dr. Logiadis, the plaintiff was "therefore very limited in his mobility due to his pain," with "a poor prognosis even if he were to have surgery." (*Id.*). Dr. Logiadis opined that the plaintiff was "most likely disabled due to his condition for life." (*Id.*).

D.    THE ALJ'S DECISION

Following the five-step evaluation process,[2] the ALJ found that the plaintiff met the insured status requirements of the Social Security Act through December 31, 2013, (Tr. 14), and that the

---

[2] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i) and 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second

plaintiff had not engaged in substantial gainful activity since his onset date, January 1, 2013. (Tr. 14, citing 20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*).

At step two, the ALJ concluded that the plaintiff had the severe impairments of degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, osteoarthritis of the right knee, and chronic obstructive pulmonary disease, (Tr. 14, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)), but that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-15, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). He also found that the plaintiff's obesity and hypertension were nonsevere. (Tr. 14-15). The ALJ then concluded, after consideration of the entire record, that since January 1, 2013, the plaintiff had the residual functional capacity ["RFC"] to perform light work, but with the following limitations: he could "occasionally bend, balance, twist, squat, kneel, crawl, and climb," he could not "climb ladders, ropes of scaffolds," he "requires an environment free from concentrated poor ventilation, dusts, fumes, gases, odors, humidity, wetness, and temperature extremes," he "must avoid hazards such as heights, vibration, and dangerous machinery but [could] drive," and he could not use "right foot controls." (Tr. 15).

---

step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater,* 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

At step four, the ALJ concluded that since January 1, 2013, the plaintiff was unable to perform any past relevant work. (Tr. 19, citing 20 C.F.R. §§ 404.1565 and 416.965). The ALJ then noted that on April 29, 2018, the plaintiff's age category changed to an individual of advanced age. (Tr. 19, citing 20 C.F.R. §§ 404.1563 and 416.963). The ALJ found that, prior to April 29, 2018, the date the plaintiff's age category changed, there were jobs that existed in significant numbers in the national economy that the plaintiff could have performed. (Tr. 20). However, beginning on April 29, 2018, there were no jobs that existed in significant numbers in the national economy that the plaintiff could perform. (Tr. 21).

Accordingly, the ALJ concluded that the plaintiff was not disabled prior to April 29, 2018, but he became disabled on that date and continued to be disabled through the date of the decision, June 28, 2018. (Tr. 21, citing 20 C.F.R. §§ 404.1520(g) and 416.920(g)). The ALJ thus found that the plaintiff was entitled to supplemental security income under section 1614(a)(3)(A) of the Social Security Act, but he was not entitled to disability insurance benefits under sections 216(i) and 223(d) of the Social Security Act. (Tr. 21).[3]

III.    STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if

---

[3] In so finding, the ALJ noted that the plaintiff was not under a disability within the meaning of the Social Security Act at any time through December 31, 2013, the date last insured. (Tr. 21, citing 20 C.F.R. §§ 404.315(a) and 404.320(b)). An individual is entitled to disability benefits while disabled before attaining full retirement age if, among other things, the person has "enough social security earnings to be insured for disability." § 404.315(a). Here, the plaintiff's date last insured was December 31, 2013. Thus, because the plaintiff did not have sufficient social security earnings to be insured for disability post-December 31, 2013, and because the ALJ found that the plaintiff was not disabled pre-April 29, 2018, the ALJ found that the plaintiff was not entitled to DIB.

the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

## IV.   DISCUSSION

The plaintiff first argues that the ALJ incorrectly found that the plaintiff's cervical spine impairment did not meet or equal the criteria of Listing 1.04. (Pl.'s Mem. at 8-10). The plaintiff next argues that the ALJ committed legal error by cherry-picking evidence and minimizing the plaintiff's impairments. (*Id.* at 10-14). Finally, the plaintiff argues that the ALJ should have limited the plaintiff to sedentary work and included limitations in the plaintiff's RFC based on the plaintiff's "cane use," "limited hand use," absenteeism and off-task behavior. (*Id.* at 14-20). The

defendant responds that the plaintiff failed to establish that his cervical spine impairment was of listings-level severity, that the ALJ properly assessed the plaintiff's RFC and that he correctly evaluated the plaintiff's subjective complaints. (Def.'s Mem. at 5-14).

A.   THE ALJ'S ANALYSIS OF LISTING 1.04

The plaintiff argues that the ALJ erred in his conclusion that the plaintiff's cervical spine impairment did not meet Listing 1.04. (Pl.'s Mem. at 8-10).

A Listing 1.04 impairment requires evidence of a spinal disorder such as a "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, [or] vertebral fracture," "resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04. Such disorder must also be accompanied by spinal arachnoiditis (Listing 1.04B), lumbar spinal stenosis resulting in pseudoclaudication (Listing 1.04C), or "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test" (Listing 1.04A). The plaintiff bears the burden of demonstrating that the impairment meets "all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990).

In his decision, the ALJ noted that he considered Listing 1.04 for disorders of the spine. (Tr. 15). He concluded that the plaintiff's cervical spine condition did not meet Listing 1.04 because "the record does not evidence motor loss with accompanying sensory or reflex loss . . . Rather, the record shows that the claimant displayed intact sensation and full strength in the upper extremities (Exhibit 15F, Pages 1, 5)." (*Id.*). The Court finds no error in the ALJ's analysis.

Contrary to the plaintiff's argument, the record does not reflect "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," as required by Listing 1.04A. (*See* Tr. 491 (treatment notes from September 2014 reflect "no muscle atrophy," normal muscle tone and motor strength, normal gait and stance, and normal reflexes); Tr. 494-95 (treatment notes from October 2014 reflect "no sensory exam abnormalities" and normal reflexes); Tr. 647 (treatment notes from April 2015 reflect normal reflexes and muscle tone); Tr. 517 (treatment notes from October 2015 reflect normal reflexes and muscle tone); Tr. 543 (treatment notes from April 2016 reflect normal reflexes and muscle tone); Tr. 749 (treatment notes from February 2017 reflect normal reflexes and muscle tone); Tr. 677 (treatment notes from April 2017 reflect normal motor strength, sensation intact, no pain upon straight leg raising, 2+ symmetric reflexes, and mildly antalgic gait); Tr. 734 (treatment notes from June 2017 reflect normal reflexes and muscle tone); Tr. 729 (treatment notes from August 2017 reflect normal reflexes and muscle tone); Tr. 801 (treatment notes from October 2017 reflect intact sensory appreciation bilaterally); Tr. 799 (treatment notes from November 2017 reflect five out of five strength in upper extremity and intact sensory appreciation bilaterally); Tr.  805 (treatment notes from January 2018 reflect five out of five muscle strength in upper and lower extremities); Tr. 626 (September 2016 consultative examination reflecting five out of five strength in upper and lower extremities)).

The plaintiff cites treatment notes from August 7, 2013, at which appointment the plaintiff had decreased strength in his upper extremities, with three out of five strength on the left side and two out of five strength on the right side, and "symmetrically decreased" deep tendon reflexes. (Tr. 369). These treatment notes do not indicate whether the plaintiff's reflexes decreased to an abnormal level or whether the plaintiff showed any sensory loss. Nor do the treatment notes clearly

find that the plaintiff experienced motor loss.  He also cites treatment notes from November 14, 2017. (Tr. 799). At that appointment, the plaintiff demonstrated five out of five strength in his upper extremity, and his sensory appreciation was intact. (*Id.*). Thus, this appointment similarly does not support a finding of motor loss accompanied by sensory or reflex loss.

The plaintiff also appears to argue that the ALJ needed to obtain "the testimony of a medical expert to review the . . . evidence and issue an opinion" before finding that the plaintiff's cervical spine impairment did not meet a listing. (Pl.'s Mem. at 10). The ALJ was under no obligation to seek testimony from a medical expert. *See Rivera v. Comm'r of Social Sec.*, 15-CV-8439, 2017 WL 120974, at \*10 (S.D.N.Y. Jan. 12, 2017) ("An ALJ is not required to consult a medical expert to determine whether a plaintiff meets a listing."), *report and recommendation adopted*, 2017 WL 946296 (S.D.N.Y. Mar. 9, 2017) (citing 20 C.F.R. § 404.1527(e)(2)(iii) (an ALJ "may . . . ask for and consider opinions from medical experts . . . on whether his impairment equals the requirements of any impairment" in the Listings.)). Moreover, nothing in the Court's review of the record suggests that the ALJ needed medical expert testimony to determine whether the plaintiff's condition met or medically equaled a listing. As noted above, the treatment notes did not reflect motor loss accompanied by sensory or reflex loss. (*See* Tr. 491, 494-95, 517, 543, 626, 647, 677, 729, 734, 749, 799, 801, 805).  This was not a situation in which the ALJ was unable to determine from the treatment notes whether motor, sensory or reflex loss was present. Finally, Drs. Fong-Breton and Glass considered Listing 1.04 and opined that the plaintiff was not disabled. (Tr. 73, 80, 93, 100, 109, 116, 123, 130). Accordingly, the ALJ did not err in finding that the plaintiff's cervical spine condition did not meet Listing 1.04.

B.      THE ALJ DID NOT ERR IN HIS EVALUATION OF THE EVIDENCE

The plaintiff argues that the ALJ cherry-picked and mischaracterized the evidence. The plaintiff first states that "the ALJ wrote that [the plaintiff's] doctors have noted 'non-severe lumbar findings' (Tr. 16 citing to 15F, 5)." (Pl.'s Mem. at 11). The plaintiff points to the treatment notes cited by the ALJ (Exhibit 15F, Page 5), which reflect a visit to Dr. Zimmerman on April 13, 2017. (Tr. 803). Though the plaintiff's brief is unclear, it appears that the plaintiff is arguing that the ALJ engaged in "prohibited cherry-picking" by referencing this finding and not other portions of Dr. Zimmerman's April 13, 2017 treatment notes. (*Id.*).

Preliminarily, the plaintiff has misquoted the ALJ's decision. The language quoted by the plaintiff does not appear anywhere in the ALJ's decision. Instead, the plaintiff appears to be taking issue with this sentence: "The claimant's neurological specialist characterized these findings as not severe (Exhibit 15F, Page 5)." (Tr. 16). The ALJ's statement is supported by the record. A review of the decision makes clear that "the findings" the ALJ is referring to are the plaintiff's MRI results. (*Id.*). The cited treatment notes include Dr. Zimmerman's opinion that the plaintiff's "MRI is not severe." (Tr. 803). Moreover, nothing in the record indicates that Dr. Zimmerman gave another opinion on the severity of the plaintiff's MRIs. Accordingly, the Court finds no error in the ALJ's analysis.[4]

Additionally, the plaintiff takes issue with the ALJ's finding that, although "the claimant experienced limited neck range of motion and pain attendant to his cervical spine impairment[,] . . . this pain was manageable and he maintained healthy functioning of his upper extremities." (Pl.'s

---

[4] In the same paragraph, the plaintiff argues, in one sentence, that "the ALJ focused on negative findings, including visits during which [the plaintiff] had normal range of motion, or did not need help getting onto or off of an examining table." (Pl.'s Mem. at 11). The plaintiff did not cite any medical records or other evidence to support this argument. The Court will thus not address this argument separate from the Court's finding below that the ALJ's RFC assessment was supported by substantial evidence.

Mem. at 11). The plaintiff lists various treatment notes evidencing his reports of pain from 2010 to 2013, and he argues that "[c]learly" he "did not have 'healthy functioning of his upper extremities.'" (*Id*. at 11-12). The plaintiff then argues that the ALJ erred in his evaluation of the plaintiff's subjective complaints of pain, specifically, by not considering how the plaintiff's pain fluctuated and by noting the plaintiff's own statement to his neurological specialist that he could live with the neck pain. (*Id.* at 12-3).

The Court finds no error in the ALJ's analysis. An ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). In support of the ALJ's finding regarding the plaintiff's cervical spine condition and resulting pain, the ALJ cited the plaintiff's statement, diagnostic evidence, treatment notes from the plaintiff's treating physicians, the report from the plaintiff's consultative examination, and the plaintiff's treatment history. (Tr. 16-17).

This evidence supports the ALJ's finding. The plaintiff consistently had normal muscle tone and reflexes, (*see* Tr. 476, 491, 494-95, 647, 517, 543, 729, 734, 749 (July 2014, September 2014, October 2014, April 2015, October 2015, April 2016, February 2017, June 2017, August 2017)), and full muscle strength in his upper extremities. (*See* Tr. 799 (treatment notes from November 2017 reflect that the plaintiff demonstrated five out of five strength in upper extremity and his sensory appreciation was intact bilaterally); Tr.  805 (treatment notes from January 2018 reflect five out of five muscle strength in upper extremities)). The plaintiff also reported that he could "live with the neck pain." (Tr. 799). On examination, Dr. Reiher, the consultative examiner, found that the plaintiff's cervical spine "show[ed] full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." (Tr. 626). He had full range of motion of his shoulders,

elbows, forearms, and wrists bilaterally. (*Id.*). His strength was five out of five in the upper extremities. (*Id.*). Dr. Reiher opined that the plaintiff had mild postural limitations due to back and neck pain. (Tr. 627). Accordingly, a remand is not warranted on this basis.

The plaintiff also includes a paragraph on the plaintiff's cane use, but his argument on this issue is unclear. The plaintiff states that "providers have addressed his cane use in his medical notes, and it appears that his cane is medically necessary." (Pl.'s Mem. at 14). He does not point to, nor does the Court's review of the record indicate, any prescription for, or recommendation that, the plaintiff use a cane. If he is arguing that the ALJ erred in noting that "the medical record does not evidence any prescription or recommendations by a medical provider," (Tr. 17), there is no support for this argument in the record. And if he is arguing that the ALJ should have included additional limitations in the RFC based on his cane use, this argument is similarly not supported by the record.  Dr. Reiher found in September 2016 that the plaintiff's gait was normal, he could do a "half squat," his stance was normal, he used no assistive devices, he did not need help getting on and off the exam table, and he could rise from his chair without difficulty. (Tr. 625). Further, the record shows that the plaintiff healed from his May 24, 2016 right knee arthroscopy without any complications. Though the plaintiff reported knee pain post-surgery, the diagnostic evidence relating to his knee does not support additional limitations. (*See* Tr. 628 (October 3, 2016 x-ray of his right knee revealed moderate primary osteoarthritic changes, while an x-ray of his left knee revealed a "negative study")).

Finally, the plaintiff takes issue with the ALJ's statement that the plaintiff "worked a painting job requiring repetitive kneeling and squatting as late as 2016." (Tr. 17). The plaintiff argues that his 2016 painting job, "which he was unable to perform," "is not an indicat[ion] of his ability to perform work activity." (Pl.'s Mem. at 14). Notably, the plaintiff's statement is factually

26

incorrect. Indeed, at the plaintiff's hearing, he testified that his last job was in 2016 "doing some painting" for Griffin Hospital. (Tr. 33). He testified that the job was full-time, "about a month's worth of work," which he completed. (Tr. 33-34). He turned down an offer of employment from Griffin Hospital *after* the initial month of work due to his impairments. (Tr. 48-49). Moreover, the fact that the plaintiff was able to work this painting job in 2016 can be considered as relevant evidence by the ALJ. It was not unreasonable for the ALJ to find that the plaintiff's ability to complete a painting job in 2016 supported the ALJ's RFC assessment limiting the plaintiff to light work.  This Court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings, *see id.*, and the Court can find no error in the ALJ's evaluation of the evidence.

C.   <u>SUBSTANTIAL EVIDENCE SUPPORTS THE RFC ASSESSMENT</u>

The plaintiff argues that the ALJ erred in his RFC assessment because he should have limited the plaintiff to "sedentary exertion work," accounting for the plaintiff's "cane use," "limited hand use," "absenteeism" and "off-task behavior." (Pl.'s Mem. at 16-20). The defendant argues that substantial evidence supports the ALJ's RFC assessment and that the ALJ properly evaluated the plaintiff's subjective complaints. (Def.'s Mem. at 7-14).

The plaintiff's RFC is "the most []he can still do despite h[is] limitations" and is determined "based on all the relevant evidence in [the] case record[,]" namely, "all of the relevant medical and other evidence." 20 C.F.R. § 404.1527(a)(1), (3); *see also Gonzales v. Berryhill*, No. 3:17-CV-1385 (SALM), 2018 WL 3956495, at *14 (D. Conn. Aug. 17, 2018). "[A]n individual's RFC 'is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d

Cir. 2013) (quoting Social Security Ruling ["S.S.R."] 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996)). Before classifying a plaintiff's RFC based on exertional level, an ALJ "must first identify the individual's functional limitations or restrictions and assess [] h[is] work-related abilities on a function-by-function basis[]." *Id.* (internal quotation marks omitted).

However, "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision[.]'" *Id.* at 178 n. 3 (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). "This court must affirm an ALJ's RFC determination when it is supported by substantial evidence in the record." *Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (citing 42 U.S.C. § 405(g)) (summary order); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Here, as discussed above, the ALJ concluded, after careful consideration of the entire record, that since January 1, 2013, the plaintiff had the RFC to perform light work, but with the following limitations: he could "occasionally bend, balance, twist, squat, kneel, crawl, and climb," he could not "climb ladders, ropes of scaffolds," he "requires an environment free from concentrated poor ventilation, dusts, fumes, gases, odors, humidity, wetness, and temperature extremes," he "must avoid hazards such as heights, vibration, and dangerous machinery but [could] drive," and he could not use "right foot controls." (Tr. 15).

Substantial evidence supports the ALJ's RFC assessment. The ALJ's RFC findings are supported by the treatment notes, the diagnostic evidence, the opinion of consultative examiner Dr. Reiher, and the opinions of state agency examiners Drs. Fong-Breton and Glass.

First, the treatment notes are consistent with the level of functioning the ALJ assessed in his decision. Nothing in the treatment notes suggests that the ALJ should have imposed additional exertional limitations. The plaintiff consistently had normal muscle tone and reflexes, (*see* Tr. 476,

491, 494-95, 647, 517, 543, 729, 734, 749 (appointments from July 2014, September 2014, October 2014, April 2015, October 2015, April 2016, February 2017, June 2017, August 2017)), a normal or mildly antalgic gait, (*see* Tr. 476, 491, 625, 677, 846, 845 (appointments from July 2014, September 2014, September 2016, April 2017, June 2017, August 2017)), and full muscle strength in his upper and lower extremities. (*See* Tr. 799 (treatment notes from November 2017 reflect that the plaintiff demonstrated five out of five strength in upper extremity and his sensory appreciation was intact bilaterally); Tr. 805 (treatment notes from January 2018 reflect five out of five muscle strength in upper and lower extremities)). Moreover, in August 2014, Dr. Abidor noted that the plaintiff was "stable" (Tr. 411); in October 2015, Dr. Logiadis noted that the plaintiff's sciatica was "stable on percocet" (Tr. 518); in April 2017, Dr. Zimmerman noted that the plaintiff was "neurologically stable" (Tr. 677); and in November 2017, Dr. Lipow recommended non-surgical management. (Tr. 800). The plaintiff also reported that he could "live with the neck pain." (Tr. 799).

Further, the objective diagnostic evidence on the plaintiff's lumbar and cervical spine impairments does not support more than the imposed limitations. (*See* Tr. 350 (February 19, 2010 MRI of the cervical spine revealed multilevel degenerative changes "most prominent at . . . C5-6 . . . [with] very mild cord impingement" and "marked foraminal stenosis," as well as "fairly marked right foraminal stenosis at C4-5" with "no cord compression"); Tr. 415-16 (July 11, 2013 MRI of the cervical spine revealed multilevel degenerative changes with "associated central stenosis with mild cord impingement at . . . C5-6," "marked right foraminal stenosis at C4-5," and "marked bilateral foraminal stenosis at C5-6"); Tr. 413-14 (July 11, 2013 MRI of the lumbar spine revealed "[s]mall disc protrusions at multiple levels," with no "associated central canal stenosis or cord compression"); Tr. 417-18 (July 11, 2013 MRI of the thoracic spine showed mild multilevel

29

degenerative changes with "associated moderate central canal stenosis at L3-4 and mild central canal stenosis at L4-5," with no evidence of nerve root compression); Tr. 622 (April 11, 2016 MRI of the lumbar spine revealed "[m]inimal to mild degenerative disc disease at all lumbar levels," "[m]ultifactorial spondylosis" causing "spinal stenosis and foraminal stenosis at L3-4 and L4-5 without . . . nerve root impingement," and a "[s]table, small left paramedian disc herniation at T12-L1"); Tr. 658 (March 30, 2017 MRI of the lumbar spine showed multilevel degenerative changes with "moderate to severe spinal canal stenosis" and "moderate bilateral neuroforaminal stenosis" at L4-5); Tr. 807 (November 14, 2017 MRI of the lumbar spine showed a "[s]mall left-sided disc herniation . . . and multilevel degenerative changes," with "associated mild central canal stenosis and mild to moderate foraminal narrowing"); Tr. 809 (November 14, 2017 MRI of the cervical spine showed mild anterolisthesis, mild ventral cord impingement at C5-6, and multilevel degenerative changes, with mild central canal stenosis)). Indeed, Dr. Zimmerman, a neurosurgeon and one of the plaintiff's treating physicians, characterized the plaintiff's MRI of his lumbar spine in March 30, 2017 as "not severe." (Tr. 677).

Moreover, while the plaintiff had a right knee arthroscopy on May 24, 2016, the record shows that he healed from this surgery without any complications. Though the plaintiff reported knee pain after his surgery, the diagnostic evidence relating to his knee similarly does not support additional limitations. (*See* Tr. 628 (October 3, 2016 x-ray of his right knee revealed moderate primary osteoarthritic changes, while an x-ray of his left knee revealed a "negative study")).

The ALJ's conclusion that the plaintiff could do light work with additional limitations is also supported by Dr. Reiher's findings and conclusions. Dr. Reiher found that his gait was normal, he could do a "half squat," his stance was normal, he used no assistive devices, he did not need help getting on and off the exam table, and he could rise from his chair without difficulty. (Tr.

625). The plaintiff's cervical and lumbar spines "show[ed] full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." (Tr. 626). A straight leg raising test was negative bilaterally. (*Id.*). He had full range of motion of his shoulders, elbows, forearms, wrists, hips, and ankles bilaterally. (*Id.*). His left knee flexion was "full," while his right knee flexion was "120 degrees." (*Id.*). His joints were stable and nontender, except for "decreased sensation to light touch in the right knee." (*Id.*). His strength was five out of five in the upper and lower extremities. (*Id.*). His hand and finger dexterity were intact, with five out of five grip strength bilaterally. (*Id.*). Dr. Reiher opined that the plaintiff had "mild postural limitations due to back, neck, and knee pain, producing mild limitations with climbing, stooping, bending, crawling, kneeling, crouching, and reaching," and environmental limitations of exposure to dust, fumes, smoke, and heights. (Tr. 627). The ALJ gave this opinion "some weight," incorporating Dr. Reiher's postural and environmental limitations but noting that Dr. Reiher had not addressed the plaintiff's exertional ability. (Tr. 18).

The ALJ's RFC assessment is also supported by the state agency physicians. Dr. Fong-Breton opined that the plaintiff could occasionally lift and carry 20 pounds; could frequently lift and carry 10 pounds; could stand and/or walk and sit for six hours in an eight-hour workday; and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (Tr. 73, 75-76). She also opined that the plaintiff could never climb ladders, ropes or scaffolds, and that he needed to avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, and poor ventilation. (Tr. 75-76). She noted that the plaintiff did not need a hand-held assistive device for ambulation. (Tr. 75). Dr. Glass opined to substantially the same limitations, except that he indicated that the plaintiff needed to avoid hazards, such as machinery and heights. (Tr. 124-129). The ALJ gave both opinions "substantial weight," and he incorporated their limitation to light work and their postural and environmental restrictions into the RFC assessment. (Tr. 18).

The ALJ thus accounted for the plaintiff's physical limitations in the RFC by concluding that he was limited to light work with additional limitations. Contrary to the plaintiff's argument, the treatment notes, the diagnostic evidence and the physician opinions do not support a finding that the ALJ should have limited the plaintiff to sedentary work, or included further restrictions based on the plaintiff's cane use, absenteeism or off-task behavior. Nor does the record support a limitation for handling, fingering, and feeling. In support of this argument, the plaintiff cites only his hearing testimony. (Tr. 42-46). Of the cited portions of his testimony, the only excerpt which related to handling and fingering was his testimony that he could "button [his] shirt" but could not hold a pen and write a full letter. (Tr. 45). The record, however, does not include any findings by a physician that the plaintiff was so limited. Indeed, at the plaintiff's consultative examination, his hand and finger dexterity were intact, with five out of five grip strength bilaterally. (Tr. 626).

Further, the ALJ was not obligated to develop further the administrative record after finding that Dr. Logiadis's opinion was "nonspecific." (Tr. 18-19). The plaintiff argues that, "[w]here the basis for a [t]reating [p]hysician's opinion is unclear, the ALJ has an 'affirmative duty to develop the administrative record.'" (Pl.'s Mem. at 17). Such is not the case here. In his decision, the ALJ noted that (1) Dr. Logiadis's statement that the plaintiff was disabled is not a medical opinion, but rather a finding on an issue reserved to the Commissioner; and (2) Dr. Logiadis's statement that the plaintiff had "very limited mobility is nonspecific." (Tr. 18). The ALJ then stated that, "to the extent this statement reflects an opinion [that] the [plaintiff] is more limited than the assigned [RFC]," such an opinion is inconsistent with Dr. Logiadis's finding that the plaintiff exhibited a normal gait. (*Id.*). The ALJ thus properly gave "good reasons" for discounting Dr. Logiadis's opinion. Moreover, the 850-page administrative record contains Dr. Logiadis's treatment notes, as well as medical records from the plaintiff's other treating physicians.

Thus, the ALJ had sufficient evidence upon which he could evaluate Dr. Logiadis's opinion and assess the plaintiff's RFC. No duty to recontact was triggered. *See Morris v. Berryhill*, 721 F. App'x 25 (2d Cir. 2018) (summary order) ("The duty to recontact arises only if the ALJ lacks sufficient evidence in the record to evaluate the doctor's findings, not when the treating physician's opinion is inconsistent with [his] own prior opinions and the rest of the record.").

Therefore, the Court finds that the ALJ did not err and that the RFC assessment is supported by substantial evidence. *See Hanson v. Comm'r of Soc. Sec.*, No. 15-CV-150 (GTS) (WBC), 2016 WL 3960486, at *12 (N.D.N.Y. June 29, 2016) ("Under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence . . . Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in record."), *report and recommendation adopted sub nom. Hanson v. Colvin*, No. 15-CV-150 (GTS) (WBC), 2016 WL 3951150 (N.D.N.Y. July 20, 2016)).

V.    <u>CONCLUSION</u>

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 14) is *denied*, and the defendant's Motion to Affirm (Doc. No. 17) is *granted.*

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

Dated this 26th day of May, 2020 at New Haven, Connecticut.

                                         _/s/Robert M. Spector, USMJ
                                         Robert M. Spector
                                         United States Magistrate Judge